**Prentiss E. SMITH, M.D.**

**v.**

**OUR LADY OF THE LAKE HOSPITAL, INC., et al.**

**Civ. A. 87-532-B.**

United States District Court, M.D. Louisiana.

Jan. 22, 1991.

John M. Landis, Randall A. Smith, Phillip A. Wittmann and Marc D. Winsberg, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., Kevin Patrick Monahan, Vinet & Monahan, Baton Rouge, La., for Prentiss E. Smith, M.D.

Roger M. Fritchie, T. MacDougall Womack, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for Our Lady of the Lake Hosp., Inc., M.J. Rathbone, Jr., M.D., W. Redfield Bryan, M.D., Sidney Duplessis, W.H. LeBlanc, Jr., Roland Toups, Robert Davidge, and others whose identities and/or roles are unknown to plaintiff at this time.

Leon Gary, Jr., J. Rodney Ryan, Jr., Gary, Field, Landry & Bradford, ALC, Baton Rouge, La., William C. Kaufman, III, Seale, Smith, Zuber and Barnette, Baton Rouge, La., for Dr. B. Eugene Berry, M.D.

Lloyd J. Lunceford, Tom F. Phillips, Fredrick R. Tulley, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for Kenneth C. Cranor, M.D., A. Foster Sanders, M.D., Donald R. Cowick, M.D., W. Howard Kisner, M.D. and Louis P. Laville, Jr., M.D.

Charles S. Weems, III, J. Ogden Middleton, II, Gold, Weems, Bruser, Sues & Rundell, Alexandria, La., for Phillip A. Wittmann, John M. Landis, Randall A. Smith and Marc D. Winsberg.

## OPINION

POLOZOLA, District Judge.

This case presents a clear example of the need and purpose for Rules 11 and 26(g) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the inherent power of the Court to impose sanctions. The plaintiff, Dr. Prentiss Smith, and his attorneys, Phillip A. Wittmann, John M. Landis, Randall A. Smith, and Marc D. Winsberg, have openly and flagrantly abused the judicial system by causing unnecessary delay and harassment, making scandalous, unjustified, and unsupported allegations in their pleadings, abusing the discovery procedures of the federal court, and proceeding in an improper and frivolous manner with callous disregard of the judicial system. Their actions must and shall come to an abrupt end.

Therefore, the Court finds that Phillip A. Wittmann, John M. Landis, Randall A. Smith, and Marc D. Winsberg have violated the provisions of Rules 11 and 26(g) of the Federal Rules of Civil Procedure, and 28 U.S.C. § 1927. The Court also finds that Dr. Prentiss Smith has violated Rules 11 and 26(g) of the Federal Rules of Civil Procedure. Finally, the Court finds that the attorneys listed above and Dr. Smith shall be sanctioned under the inherent power of the Court to impose sanctions.

### I. Background

The Court believes that it is necessary to set forth the history of the litigation in this case in order that the record might reflect the reasons for the Court's decision to impose sanctions.

The complaint on its face suggests that the plaintiff filed an action against Our Lady of the Lake Hospital, Inc., several members of the board, certain doctors, and other administrators at the hospital under the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. §§ 1961–1962 (RICO). However, an examination of the record reveals a scheme on the part of the plaintiff and his attorneys to employ tactics involving an abuse of the judicial machinery and process, bad faith and dilatory tactics, misstatements and half-truths to the Court in arguments and briefs, and engaging in conduct that borders on being unethical, if it is not so.

Dr. Prentiss Smith filed this suit under the civil RICO statute for $22 million against Our Lady of the Lake Hospital; its medical director, Dr. M.J. Rathbone, Jr.; its executive director and board member, Robert C. Davidge; four other members of its fourteen member board of trustees, Dr. W. Redfield Bryan, Sidney Duplessis, W.H. LeBlanc, Jr., and Roland Toups; Doctors Kenneth C. Cranor, A. Foster Sanders, Donald R. Cowick, W. Howard Kisner, and Louis P. Laville, Jr., who were members of the executive committee; and Dr. B. Eugene Berry, a former chief-of-staff at the hospital.

The plaintiff has alleged that these defendants were engaged in corrupt and criminal activity when the hospital terminated Dr. Smith's privileges at Our Lady of the Lake Hospital. The specific criminal statutes which the plaintiff alleged the defendants violated were the mail and wire fraud statutes set forth in Title 18 of the United States Code.[1] When the plaintiff filed his federal suit, he also filed a state court suit in the 19th Judicial District Court for the Parish of East Baton Rouge, Louisiana, but did not immediately serve the state court suit. The record reveals that no action has been taken in the state court suit.

Immediately after the federal suit was filed, the plaintiff filed a motion for production of documents. Approximately one and a half months after the federal suit was filed, the first discovery problems arose in this case when a motion for a protective order was filed regarding depositions. Objections were also filed to the production of documents. After holding a conference, the Court issued an order requiring the parties to set forth a discovery plan. On September 14, 1987, the defendants filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The first hearing date on the motion was continued at the request of the parties.

---

1. 18 U.S.C. §§ 1341 and 1343.

Two days after the motion to dismiss was filed, counsel for plaintiff sent a letter to the Court requesting the Court to recuse himself. The Court was required to correct a misstatement in the letter sent by Mr. Landis to the Court regarding the recusal matter.[2] Counsel for plaintiff then filed a motion to recuse the Court, which was denied by the Court on October 16, 1987. The Court permitted the plaintiff to appeal the denial of the motion to recuse to the Fifth Circuit Court of Appeals, which declined to hear the plaintiff's appeal. In November of 1987, plaintiff began to issue numerous notices of depositions. More discovery problems then developed in this case.

In February of 1988, while the motion to dismiss was pending, the plaintiff sought to amend his complaint to add an antitrust claim against some of the defendants and to name additional parties as defendants in the antitrust suit who were not defendants in the RICO action. The Court gave the defendants time to file a response to the motion to amend.

On March 9, 1988, Lloyd Lunceford, one of the attorneys representing some of the defendants in this case, sent Mr. Landis a letter advising the plaintiff and his counsel of these defendants' intention to seek Rule 11 sanctions in this case. A similar letter was sent to plaintiff's counsel by Roger Fritchie on April 13, 1988, on behalf of other defendants.

On March 17, 1988, the Court issued a scheduling order and set a conference to discuss the matter. At the same time, the Court stayed discovery pending the conference.[3] The Court heard oral arguments on the defendants' motion to dismiss and on plaintiff's motion to amend on April 22,

1988. Despite the misleading statements counsel for plaintiff have made in briefs and oral argument, the Court denied the motion to amend for the following reasons:

And insofar as the motion to amend on the antitrust case is concerned, I am not going to grant that motion. I will let the plaintiff file a separate action, but I am not going to let him amend to include that action in this one. There are too many different parties, too many different legal issues. The causes of actions are totally different. And I think the case could best be handled from a case management standpoint if it would be filed in a separate action.[4]

The Court then heard oral arguments on defendants' motion to dismiss. At the time of oral argument, counsel for plaintiff had taken 21 depositions, which included the depositions of nine cardiologists, two anesthesiologists, a cardiovascular surgeon, a radiographer, a perfusionist, a urologist, a general surgeon, and five depositions from representatives of the hospital, including a Rule 30(b)(6) deposition[5] of the hospital. The depositions exceeded some 2,200 pages of testimony. Plaintiff and his counsel had also received and presumably read over 3,000 pages of documents prior to the hearing. The Court heard oral arguments on the motion to dismiss and took the matter under advisement.

Plaintiff then voluntarily dismissed this case on September 14, 1988. In the second motion plaintiff's counsel filed to recuse this Court, the plaintiff's counsel stated in their brief that "Dr. Smith voluntarily dismissed this action in order to pursue his claims in a less hostile forum."[6] This is one of many unsupported, unfounded, and unethical statements and misstatements about the facts of this case that counsel for plaintiff have directed against this judge.[7]

---

2. This was the first of many misstatements made by counsel for plaintiff in these proceedings.

3. Despite plaintiff's counsel's incorrect assertion, the record reveals that the stay order permitted the parties to conduct discovery for good cause shown.

4. Transcript of Hearing on April 22, 1988, at 5.

5. Fed.R.Civ.P. 30(b)(6).

6. Memorandum in support of second motion to recuse, filed August 16, 1990, at 6.

7. Many of these facts were set forth by the Court in its oral reasons for denying the second motion to recuse filed in this case and shall not be repeated herein. However, the Court adopts the reasons set forth in its earlier ruling on the plaintiff's motion to recuse the Court as additional reasons in support of the action taken by the Court at this time.

After the plaintiff dismissed his suit, the defendants filed a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the inherent power of the Court to impose sanctions. The Court also questioned whether or not sanctions should be imposed under Rule 26(g) of the Federal Rules of Civil Procedure. After briefs were filed and the Court heard oral arguments on the motion for sanctions, the Court, for oral reasons assigned in the record, found that sanctions should be imposed in this case. The Court also ordered Landis and Winsberg to show cause why they should not be suspended or disbarred from practice before the Middle District of Louisiana because of the brief submitted and oral argument made in connection with the second motion to disqualify.

Counsel for plaintiff are well qualified in the RICO area and have handled many cases of this nature. A review of the record clearly shows that had the plaintiff and his counsel made even the slightest inquiry required under Rule 11, they would have determined that there was no legal or factual basis for this RICO suit. Whatever claims plaintiff may have regarding the termination of his privileges at Our Lady of the Lake Hospital, he did not have a legal or factual basis for a RICO suit. Merely saying that the Fifth Circuit in *R.A. G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350 (5th Cir.1985), permitted the plaintiff to allege two related acts of racketeering activity to satisfy the pattern requirement is not enough. To support this allegation, there still must be evidence of criminal activity, which simply does not exist in the evidence presented to the Court, and which was the same evidence plaintiff and his counsel had available to them at the time the RICO suit was filed.

Plaintiff says that the defendants were engaged in criminal activity when they terminated his privileges at the hospital. The record shows that the proceedings against Dr. Smith began in 1982 when the executive committee began investigating complaints from recovery room nurses at Our Lady of the Lake Hospital regarding Dr. Smith's medically improper and personally abusive and offensive conduct. The ad hoc committee gave the plaintiff two months to resolve this problem or his privileges would be terminated.[8] The earlier probation was extended for one year but did not terminate Dr. Smith's privileges at the hospital. During this probation period, the hospital began to review the mortality rates of patients on whom Dr. Smith had operated. This review also included a summary of the mortality rates of other doctors who performed similar surgery at Our Lady of the Lake Hospital.[9]

It must be noted that Dr. Smith's hospital number but not his name was used on these initial inquiries. Furthermore, Dr. Smith was kept fully advised of the investigation being conducted by the hospital and even had counsel represent him during part of the investigation and later proceedings in this matter. In September of 1984, the Ethics Committee from the Society of Thoracic Surgeons wrote a letter to Dr. M.J. Rathbone, Jr., Director of Medical Affairs at Our Lady of the Lake Hospital, advising him of the appointment of a committee and also requesting more information about the subjects set forth in the earlier letter. This information was also provided to the committee.

The Ethics Committee from the Society of Thoracic Surgeons, an independent committee disassociated from the hospital or any of its committees, issued its report on May 5, 1985. Dr. Smith's privileges at Our Lady of Lake Hospital were terminated at a meeting held on March 11, 1985. The hospital's Cardiovascular Diagnostic Service and the Thoracic and Cardiovascular Service and Tissue Committee also reviewed Dr. Smith's record at Dr. Smith's request, and found that Dr. Smith was not meeting the standards of surgery at the hospital. On March 12, 1985, the chief-of-staff advised Dr. Smith that he was "suspended." Thereafter, the appeal process

---

**8.** *See* Exhibit "N" to the defendants' motion for sanctions.

**9.** *See* Letter of Dr. Sanders dated March, 14, 1984, to Dr. George Lindsmith, Chairman of the Committee on Standards and Ethics of the Society of Thoracic Surgeons.

began at the hospital, which ended in Dr. Smith's privileges being terminated on June 27, 1986.

Based on these facts, the plaintiff, in his complaint, alleged that the defendants were engaged in a scheme to defraud him and to help Dr. Eugene Berry, an alleged competitor. The Court has examined the documents that plaintiff's counsel submitted for in camera review, which apparently was part of the reasonable inquiry these attorneys made prior to filing the RICO suit. These documents were later filed in the record without objection from the plaintiff. The plaintiff's attorneys also talked to the plaintiff and presumably read the hospital records involved in this case. It can hardly be said that the few documents the plaintiff's attorneys submitted to the Court for an in camera review, or the other documents submitted to the Court, contained sufficient facts to form the basis of an allegation of criminal activity against the defendants under the RICO statute. The only possible defendant who may have had any economic motive in this case was Dr. Berry. All of the other defendants had no economic interest but did have the responsibility to monitor professional competency and integrity at the hospital. Despite the lack of evidence of criminal activity on the part of the defendants, the plaintiff, in his pleadings, briefs, and oral argument, designated the defendants as conspirators, racketeers, and persons engaged in a scheme to defraud. To say that the facts set forth in this case could have led any person making a reasonable inquiry into the facts and law to conclude that there was a scheme to defraud and a pattern of racketeering as required under the RICO statute is to ignore reality in favor of a motive of revenge, embarrassment, and a backdoor effort to overturn the termination of privileges rather than to right legal wrongs.

The amount of review, the manner in which the review was conducted, and the outward attempt on the part of those conducting the review at the hospital to be sure of their decision to terminate Dr.

Smith's privileges contradicts any allegations of criminal activity in this case. Indeed, the independent review by the Society of Thoracic Surgeons entailed 100 hours of review of over 3,000 pages of medical records and conferences with Dr. Smith before a decision was made. The affidavits of the doctors of the Society of Thoracic Surgeons who conducted this review state no effort of any kind was made by the defendants to influence their vote or decision.

The impermissible, misleading and half-truth pleadings, briefs, and oral arguments made by the plaintiff and his counsel cannot be tolerated. The Court shall not allow a party to use hired guns to make allegations of fraud and criminal activity on the basis of speculation and implausible inferences which are not only inconsistent with the facts, but could or should have been discovered from the slightest investigation of the facts. Plaintiff's reliance on *R.A.G. S.*[10] is not enough to excuse the plaintiff's blatant disregard of the facts and law in this case.

The Court must question the real purpose for which the plaintiff filed this RICO suit. The evidence suggests it was to be used as a vehicle to develop facts for an antitrust suit or for use in the state court suit. The Court must note that these same attorneys were involved in a similar activity in two other cases before this Court: *Starns v. Avent*, 96 B.R. 620 (M.D.La. 1989), *aff'd*, 891 F.2d 583 (5th Cir.1990); *Collins v. Polk Chevrolet*, 115 F.R.D. 326 (M.D.La.1987). In the *Starns* case, counsel for plaintiff represented the trustee in a bankruptcy proceeding. These attorneys, together with the plaintiff in the *Collins* suit, then embarked on a series of depositions knowing full well that a number of depositions were to be taken of parties who had been sued but not served. Counsel did not advise those parties of the fact that they had been sued. The Court, in the *Collins* opinion, refused to allow the parties to use the depositions in the *Collins* case. The Court also criticized the counsel from the Stone, Pigman, Walther, Witt-

10. 774 F.2d 1350 (5th Cir.1985).

mann & Hutchinson (Stone, Pigman) firm, the same law firm involved in this case, for its actions.[11]

## II. The Rule 11 Violation

[1, 2] In several recent cases, the Fifth Circuit Court of Appeals has set forth the standard the Court must apply in imposing Rule 11 sanctions. It is clear that good faith on the part of the attorney and his client is no longer enough to protect them from Rule 11 sanctions. Counsel must make a reasonable inquiry into both the factual and legal basis of the suit before signing the pleadings. The fact that the pleadings initially satisfy the requirements of Rule 11 does not satisfy the obligations of counsel and the parties under that Rule.

In *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866, 873–76 (5th Cir. 1988) (en banc), the Fifth Circuit Court of Appeals set forth the following standards the Court must apply in determining whether to impose sanctions under Rule 11:

It is well established that Rule 11 imposes the following affirmative duties with which an attorney or litigant certifies he has complied by signing a pleading, motion, or other document: (1) that the attorney has conducted a reasonable inquiry into the facts which support the document; (2) that the attorney has conducted a reasonable inquiry into the law such that the document embodies existing legal principles or a good faith argument "for the extension, modification, or reversal of existing law"; and (3) that the motion is not interposed for purposes of delay, harassment, or increasing costs of litigation.

\*　\*　\*　\*　\*　\*

Instead, we believe that a construction of Rule 11 which evaluates an attorney's conduct at the time a "pleading, motion, or other paper" is signed is consistent with the intent of the rulemakers and the plain meaning of the language contained in the rule. Like a snapshot, Rule 11 review focuses upon the instant when the

picture is taken—when the signature is placed on the document.

\*　\*　\*　\*　\*　\*

As a practical matter, while the review of an attorney's conduct for Rule 11 purposes is isolated to the moment the paper is signed, virtually all suits will require a series of filings. This series of filings may indicate a pattern of attorney conduct of some consequence. On the other hand, one or more of the filings may indicate attorney conduct entirely different from that reflected by previous filings. In any event, Rule 11 applies to each and every paper signed during the course of the proceedings and requires that each filing reflect a reasonable inquiry.

\*　\*　\*　\*　\*　\*

The determination of whether a reasonable inquiry into the facts has been made in a case will, of course, be dependent upon the particular facts; however, the district court may consider such factors as the time available to the signer for investigation; the extent of the attorney's reliance upon his client for the factual support for the document; the feasibility of a prefiling investigation; whether the signing attorney accepted the case from another member of the bar or forwarding attorney; the complexity of the factual and legal issues; and the extent to which development of the factual circumstances underlying the claim requires discovery. As to the determination of whether a reasonable inquiry into the law has been made, a district court may consider the time available to the attorney to prepare the document; the plausibility of the legal view contained in the document; the pro se status of a litigant; and the complexity of the legal and factual issues raised.

More recently, the Fifth Circuit found that a party's right to assert and argue a reasonable interpretation of the law "did not include the authority to file misleading or incomprehensible pleadings, to use the

---

11. *See Collins,* 115 F.R.D. at 328–29. The purpose of reviewing in some detail these particular cases is to point out the apparent similarities

in the actions in which plaintiff's counsel conducted themselves in these particular cases and in the case now before the Court.

discovery process for harassment, or to level frivolous allegations of conflicts of interest."[12]

The Court has previously set forth the history of the litigation between these parties. It is clear that had Dr. Smith and his counsel made a reasonable inquiry as required by Rule 11, they would and should have concluded that this RICO suit was totally frivolous and without merit. It would not have taken much of an inquiry to discover this fact. It is obvious to the Court that Dr. Smith and his attorneys filed this suit for the sole purpose of delaying, harassing, and otherwise embarrassing and intimidating the hospital from enforcing its decision to terminate Dr. Smith's privileges. The plaintiff and his attorneys have clearly and unnecessarily increased the costs of this litigation.

■ The fact that the plaintiff has voluntarily dismissed his suit does not mean that the Court should not impose sanctions or has no jurisdiction to impose sanctions. The United States Supreme Court has recently held that a court does not lose jurisdiction to impose sanctions under Rule 11 by the mere fact that a suit has been voluntarily dismissed.[13] It is also clear that only the attorneys who signed the pleadings and not the law firm may be held liable under Rule 11.[14]

■ Furthermore, it is no defense that the defendants waited until the end of the case to move for sanctions. Both the advisory committee notes to Rule 11 and the *Thomas* case suggest that a court decide the issue of sanctions at the end of the litigation, although a court may decide the sanction issue earlier if required to terminate improper conduct. The defendants did send notices of their intent to seek sanctions as early as March 9, 1988. The Court itself questioned the validity of the RICO case during oral arguments held on April 22, 1988. Plaintiff did not dismiss his suit until September 14, 1988. In addition, the reasonable inquiry required by Rule 11 must precede signing of the pleadings. A pleading, motion, or other paper may not be signed first and the basis investigated thereafter.[15] It is also clear that the Fifth Circuit Court of Appeals has imposed a greater responsibility to inquire into the facts and law on counsel who file RICO suits. Thus, in *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 685 (5th Cir.1989), the Fifth Circuit Court of Appeals imposed Rule 11 sanctions on the RICO plaintiffs. In so doing, the court stated as follows:

> [I]t should be noted that an attorney's responsibility to conduct a reasonable prefiling investigation is particularly important in RICO claims:
>
>> Given the resulting proliferation of civil RICO claims and the potential for frivolous suits in search of treble damages, *greater responsibility will be placed on the bar to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk sanctions for failing to do so.*[16]

Furthermore, in *Saine v. A.I.A., Inc.*, 582 F.Supp. 1299, 1306 n. 5 (D.C.Colo.1984), the court noted:

> A RICO defendant also needs to be protected from unscrupulous claimants lured by the prospect of treble damages, and it should be the policy of the law, within the procedural constraints of our system, to provide this protection.

\* \* \* \* \* \*

---

12. *Willy v. Coastal Corp.*, 915 F.2d 965, 967 (5th Cir.1990).

13. *Cooter and Gell v. Hartmarx Corp.*, —— U.S. ——, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). *See also Willy v. Coastal Corp.*, 915 F.2d 965 (5th Cir.1990).

14. *Pavelic and LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

15. *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1508 (9th Cir.1987); *see also* the advisory committee notes to Rule 11.

16. 865 F.2d at 685 (emphasis added), quoting Black & Magenheim, *Using the RICO Act in Civil Cases*, 22 Hou.L.Rev. 20, 24–25 (1984).

RICO should not be construed to give a pleader license to bully and intimidate nor to fire salvos from a loose cannon. Irresponsible or in-adequately considered allegations should be met with severe sanctions pursuant to Rule 11 F.R.C.P.

Some of the concerns the Court has noted above may not come within the confines of Rule 11 because certain parties may not have signed the pleadings, and the abusive conduct found by the Court may have been related to the pleadings. While some of the conduct may not come within Rule 11, much of the improper conduct found above does come within the requirements of Rule 11. To the extent any improper conduct found above does not come under Rule 11, the Court would be able to impose sanctions under 28 U.S.C. § 1927, under the inherent power of the Court to impose sanctions, and under Rule 26(g) of the Federal Rules of Civil Procedure. The Court shall now turn to a discussion of those sanctions.

### III. Violation of 28 U.S.C. § 1927

The Court finds that the plaintiff's counsel have violated the provisions of 28 U.S.C. § 1927. Section 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Sanctions under Section 1927 can only be imposed on attorneys and not the client. Also, sanctions under Section 1927 are limited to *excess* costs and expenses and attorneys' fees. It is clear that the conduct of the plaintiff's attorneys in this case unreasonably and vexatiously multiplied these proceedings. To the extent that the conduct of Dr. Smith and his attorneys may not be covered by Rule 11 or Section 1927, it is covered by the inherent power of the Court to impose sanctions for the violations found herein.

### IV. The Inherent Power of the Court to Impose Sanctions

It is clear that federal courts possess inherent powers to assess attorneys' fees and litigation costs when a party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[17] The essential element in triggering the award of attorneys' fees is the existence of bad faith on the part of the unsuccessful litigant.[18] In *Batson v. Neal*, 805 F.2d 546, 550 (5th Cir.1986) (citations omitted), the Fifth Circuit further stated:

The standards for bad faith are necessarily stringent. "Because inherent powers [to levy attorneys' fees for bad faith] are shielded from direct democratic controls, they must be exercised with restraint and discretion." A party should not be penalized for maintaining an aggressive litigation posture. "But advocacy simply for the sake of burdening an opponent with unnecessary expenditures of time and effort clearly warrants recompense for the extra outlays attributable thereto." When the request for fees is made by a successful defendant, the bad faith, vexation, wantonness, or oppression often relates to filing and maintaining the action. Courts may also award fees, however, as a sanction for bad faith in the conduct of the litigation resulting in an abuse of judicial process. Thus, while the presence of merit in a claim or defense may negate any finding of bad faith in its filing, it cannot justify abuse of the judicial process in the method of prosecution.

---

**17.** *F.D. Rich Co. v. United States ex rel. Industrial Lumber,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). *See also Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Batson v. Neal Spelce Assoc., Inc.,* 805 F.2d 546 (5th Cir.1986); *Southern Leasing Partners, Ltd. v. McMullan,* 801 F.2d 783 (5th Cir. 1986); *Roberts v. Chevron U.S.A., Inc.,* 117 F.R.D. 581 (M.D.La.1987), *aff'd,* 857 F.2d 1471

(5th Cir.1988); *NASCO, Inc. v. Calcasieu Television and Radio, Inc.,* 124 F.R.D. 120 (W.D.La. 1989), *aff'd and remanded in part,* 894 F.2d 696 (5th Cir.1990), *cert. granted,* — U.S. —, 111 S.Ct. 38, 112 L.Ed.2d 15 (1990).

**18.** *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

■ The inherent power of the Court to impose sanctions is particularly appropriate when the offending parties have practiced a fraud, deception, and misrepresentation on and to the Court. In *Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946) (citation omitted), the Supreme Court noted:

> The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question.... No doubt, if the court finds after a proper hearing that fraud has been practiced upon it, or that the very temple of justice has been defiled, the entire cost of the proceedings could justly be assessed against the guilty parties. Such is precisely a situation where "for dominating reasons of justice" a court may assess counsel fees as part of the taxable costs.

Such power is incident to the court's duty to protect the integrity of the judicial process. Accordingly, the Supreme Court has stated that the inherent "power of a court over members of its bar is at least as great as the authority over litigants." [19] The Fifth Circuit has held that "[t]he inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." [20] A court "may resort to disciplinary action against an erring attorney." [21] Further, the Fifth Circuit added that "alternative modes of discipline against the attorney might include: (1) a reprimand by the court; (2) a finding of contempt; or (3) a prohibition against practicing for a limited time before the court whose order was neglected or disregarded. It seems fairly clear that the judicious use of such measures would tend to promote attorney compliance in the first instance." [22]

In a recent case decided in the Western District of Louisiana, Judge Nauman Scott made a very appropriate comment with which this Court concurs:

> The authority of the court over its attorneys and counselors is of the highest importance. They constitute a profession essential to society. Their aid is required, not merely to represent suitors before the courts, but in the more difficult transactions of private life. The highest interests are placed in their hands and confided to their management. The confidence which they receive and the responsibilities which they are obliged to assume, demand not only ability of the highest order, but the strictest integrity. The authority which the court holds over them, and the qualifications required for their admission, are intended to secure those qualities. Finally, as noted by the Supreme Court, "[c]ourts have long recognized an inherent authority to suspend or disbar lawyers." [23]

Any concerns the Court might have about imposing sanctions under the Court's inherent power where the facts may not come within Rules 11 and 26(g) of the Federal Rules of Civil Procedure or 28 U.S.C. § 1927 were put to rest by the Fifth Circuit in *NASCO, Inc. v. Calcasieu Television and Radio, Inc.*[24] Judge Patrick Higginbotham, writing for the court, set forth the following rules in determining whether or not the court had the inherent power to act in a situation possibly not covered by the Rules.

> We turn first to the relationship between the courts' inherent power to prevent obstructive conduct and particular rules that respond to such conduct at various stages of the litigation process. We limit

---

**19.** *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980).

**20.** *Flaksa v. Little River Marine Const. Co.,* 389 F.2d 885, 888 (5th Cir.1968), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968).

**21.** *Woodham v. American Cystoscope Co.,* 335 F.2d 551, 557 (5th Cir.1964).

**22.** Comment, *Sanctions at Pretrial Stages,* 72 Yale L.J. 819, 830 (1963).

**23.** *NASCO, Inc. v. Calcasieu Television and Radio, Inc.,* 124 F.R.D. 120 (W.D.La.1989), *aff'd and remanded in part,* 894 F.2d 696 (5th Cir. 1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 38, 112 L.Ed.2d 15 (1990).

**24.** 894 F.2d 696 (5th Cir.1990).

our discussion to the problem before us—whether Rule 11 and Section 1927 bar a district court from assessing fees against a party under its inherent power, when the party's conduct is not within the reach of the rule or the statute. We express no opinion whether, when the conduct is within the reach of either, the court may exceed these boundaries under the auspices of its inherent power.

It could be argued that the inferior federal courts may look only to rules of procedure and specific statutes providing remedies for obstructive conduct. The argument rests on the idea that Congress has the power to define the limits of the authority of inferior courts and that § 1927 and applicable rules adopted under the enabling acts reflect a congressional decision to confine the courts to the particular rules and statutes. After all, the argument goes, there is little point in defining procedures and remedies by particular rules if the courts retain a much broader "inherent power." We are not persuaded.

To the extent that inherent power is seen as a product of necessity, it contains its own limits. It is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function. It is power "necessary to the exercise of all others," and "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs."

Despite its linkage to necessity, it is not apparent that the inherent power is exhausted by rules addressing particular sets of problems, such as Rule 11. It is true that, to the extent conduct violates an explicit statute or rule, there is no necessity for resorting to power inherent in the judicial assignment. At the same time it does not necessarily follow that inherent power starts where rule or statute ends. Conduct may be of the genre addressed by the rule, such as an inadequate investigation preparatory to the

filing of a complaint or bad faith prosecution of a claim, but outside its particulars such as the required signing under Rule 11 or the conduct by a party rather than the lawyer under § 1927.[25]

The Fifth Circuit further stated in *NASCO:*

> By this reconciliation, when a court is faced with bad conduct frustrating its ability to discharge its judicial duty, it is not confined to the process of criminal contempt, but may impose other sanctions in order to control the litigation before it.... Having said this, and despite the uncertainty of the inherent power's full reach, we are persuaded that the rules of civil procedure and § 1927 did not displace a district court's power to shift fees for bad faith, wanton and vexatious conduct in the prosecution of the case. We quickly take comfort from the reality that this much is implicit in *Alyeska.*[26]

This Court can only say that the lawyers' protestations that they acted in good faith to defend their client are not sufficient to avoid having sanctions imposed on them in this case under either Rules 11 or 26(g), 28 U.S.C. § 1927, or the inherent power of the Court to impose sanctions in a case. The conduct of the plaintiff and his lawyers was clearly designed to burden the defendants with unnecessary expenditures and was an abuse of a judicial process. Plaintiff and his counsel have acted in bad faith and should be held accountable for their conduct.

Thus, the Court finds that sanctions may be imposed in this case under Rule 11, 28 U.S.C. § 1927, and the inherent power of the Court to impose sanctions.

### V. Sanctions Under Rule 26(g)

Finally, the Court must determine whether sanctions should be imposed under Rule 26(g) of the Federal Rules of Civil Procedure. Rule 26(g) requires that the parties make a reasonable inquiry before conducting or opposing discovery in federal court.

---

**25.** 894 F.2d at 702 (citations omitted).

**26.** 894 F.2d at 703–04, citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

Discovery abuses were the subject of a recent decision rendered by the Fifth Circuit in *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482 (5th Cir.1990).[27] The language used by the Fifth Circuit Court of Appeals in *McLeod* is very appropriate considering the discovery abuses which occurred in this case.

> When, as here, a defendants' pleadings are stricken, an appellate court's review should be particularly scrupulous lest the district court too lightly resort to this extreme sanction, amounting to judgment against the defendant without an opportunity to be heard on the merits.
>
> Nevertheless, when a defendant demonstrates flagrant bad faith and callous disregard of its responsibilities, the district court's choice of the extreme sanction is not an abuse of discretion. It is not our responsibility as a reviewing court to say whether we would have chosen a more moderate sanction. It is our responsibility solely to decide whether the district court could, in its discretion, have determined the appellant's conduct to be so flagrant as to justify striking its pleadings.[28]

The Fifth Circuit further noted "that the tactics of Quarles and his counsel are an all-too-common example of the sort of 'Rambo tactics' that have brought disrepute upon attorneys and the legal system."[29] Discovery abuses "increase the cost of litigation, to the detriment of the parties enmeshed in it; they are one factor causing disrespect for lawyers and the judicial process; and they fuel the increasing resort to means of non-judicial dispute resolution."[30] The "same condemnation of abusive discovery tactics should apply here. Counsel [for plaintiff] have an obligation, as officers of the court, to assist in the discovery process by making diligent, good-faith"[31] requests for legitimate discovery. Such was not done in this case.

The *McLeod* court discussed whether or not sanctions could be imposed for violating standards for the conduct of attorneys in the State of Texas. This Court must note that the Baton Rouge Bar Association, with this judge serving as its chairman, adopted a similar set of rules of professionalism which have been in effect for lawyers practicing in Baton Rouge for some time. This judge also served on a committee which drafted a similar code of professionalism for the Louisiana State Bar Association. While this Court is not basing its decision to impose sanctions on violations of these codes of professionalism, it must be noted that the Fifth Circuit did discuss this matter in *McLeod*.

> While this court has not yet formally adopted a similar creed, we commend the efforts of Texas' highest courts to instill a greater sense of professionalism among attorneys. Certainly, the spirit of the Federal Rules of Civil Procedure is served by adherence to similar principles of professionalism and civility.[32]

The plaintiff has questioned the Court's jurisdiction in imposing Rule 26(g) sanctions because the suit has been voluntarily dismissed. This very contention was rejected by the Fifth Circuit Court of Appeals in *McLeod* in somewhat harsh language which the appellate court directed to counsel for even suggesting that the court did not have jurisdiction under Rule 26(g).

> [A]nd then [counsel] had the effrontery to argue that the court was now without jurisdiction to sanction him as its docket order had expired. We can ill-afford to permit litigants to waste scarce court resources with disingenuous or frivolous arguments and motions asserted purely to hinder and delay the efficient operation of justice.[33]

**27.** The *McLeod* case involved sanctions under Rules 26 and 37 of the Federal Rules of Civil Procedure.

**28.** 894 F.2d at 1486, quoting *Emerick v. Fenick Indus., Inc.,* 539 F.2d 1379, 1381 (5th Cir.1976).

**29.** 894 F.2d at 1486 (footnote omitted).

**30.** *Geiserman v. MacDonald,* 893 F.2d 787, 792 (5th Cir.1989) (footnote omitted).

**31.** 894 F.2d at 1486.

**32.** 894 F.2d at 1487 (footnote omitted).

**33.** *Id.*

The Court finds that there was a violation of Rule 26(g) by the plaintiff and his counsel in this case.

## VI. Summary of Violations

This Court does not intend to permit trial by ordeal in any case. Such was the effort made by the plaintiff and his counsel in this case. The amount of legal fees, litigation costs, and expenses incurred in this suit cannot be ignored by the Court. The scandalous attack made against the defendants is based on speculation and other reasons which may never appear in the record. Such conduct cannot be condoned or permitted by this Court. Plaintiff's counsel's use of "Rambo" tactics has no place in the federal court. The abuse of the judicial process and the misleading statements and half-truths made by counsel for plaintiff in briefs and oral arguments, the baseless allegations directed against this Court, and engaging in conduct that borders on being unethical, if it is not so, shall never be condoned or tolerated. Every effort shall be made by this Court to prevent such obvious violations of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the standards of professionalism which were committed by the attorneys from the Stone, Pigman firm who represented Dr. Smith in this case.

Sanctions must be imposed in cases of this nature to convince others that such tactics shall not be tolerated in the courts of the United States.[34] Therefore, the Court finds that Phillip A. Wittmann, John M. Landis, Randall A. Smith, and Marc D. Winsberg have violated the provisions of Rules 11 and 26(g) of the Federal Rules of Civil Procedure and the provisions of 28 U.S.C. § 1927.

The Court also finds that Dr. Smith has violated Rules 11 and 26(g). Finally, the Court finds the attorneys listed above and Dr. Smith shall also be sanctioned under the inherent power of the Court to impose sanctions in this case.

The Court, having found such, is required under *Thomas v. Capital Security Services, Inc.*[35] to impose sanctions. No longer can a court find a violation of these rules without also imposing sanctions.

## VII. Sanctions

Although the Court has found that sanctions should be imposed under Rules 11 and 26(g) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the inherent power of the Court to impose sanctions, the Court shall apply the guidelines set forth in the *Thomas* case in determining the type of sanction to be imposed in this case.[36]

---

**34.** This Court is not alone in condemning tactics such as those involved in this case. Judge Sidney A. Fitzwater, who was a member of the panel in *Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284 (N.D.Tex. 1988) (en banc), stated in his recent article "Toward a Renaissance of Professionalism in Trial Advocacy," 20 Tex.Tech.L.Rev. 787, 789 (1989):

> Those whose legal careers are of sufficient length to give them the perspective of time observe that today's advocacy is marked by attorney acrimony. They note the proliferation of litigation tactics that are characterized as "hardball," "Rambo-like actions," "composed of uncivil, discourteous, combative, harassing and rude behavior." *The New York Times* reports that "practitioners talk of 'scorched earth' or 'taking no prisoners' or 'giving no quarter' in advocating a client's cause." The president of one metropolitan bar association is quoted as saying that the courtroom ethic has become "litigation is war, the lawyer is a gladiator, and the object is to wipe out the other side." (footnotes omitted).

**35.** 836 F.2d 866, 876–77 (5th Cir.1988).

**36.** *See Smith Int'l, Inc. v. Texas Commerce Bank, N.A.*, 844 F.2d 1193, 1196–97 (5th Cir.1988), wherein the Fifth Circuit Court of Appeals stated:

> We recently gave thorough consideration to Rule 11 in *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866 (5th Cir.1988) (en banc), which was handed down well after the district court's action in this case. Under *Thomas,* it is clear that appellate review of orders granting or denying sanctions is on an abuse of discretion basis. *Id.* at 872–73. **This is also the basis on which we review determinations under 28 U.S.C. § 1927.** (citations omitted). However, in this connection, as we recognized in *Thomas:* "[L]egal issues may be subsumed within a group of issues generated by a district court's decision on sanctions." 836 F.2d at 873. **This is likewise true of section 1927 review.** (emphasis supplied).

> After explaining how detailed the district court's reasons must be when sanctions are applied, and how strict the appellate court's review

The district court has broad discretion in imposing sanctions reasonably tailored to further the objectives of the Rules of Civil Procedure, Section 1927,[37] and the inherent power of the Court to impose sanctions.[38] The term reasonableness "within the context of Rule 11 must be considered in tandem with the rule's goals of deterrence, punishment, and compensation."[39] *Thomas* also requires that in determining the character and extent of the sanction, the court must be guided by the "principle that the sanction imposed should be the least severe sanction adequate to the purpose of Rule 11."[40] Both monetary and noncompensatory sanctions are authorized.[41] Thus, sanctions might include: a reprimand of the offender; mandatory continuing legal education; a fine; an award of reasonable expenses, including reasonable attorneys' fees incurred as a result of the misconduct; reference of the matter to the appropriate attorney disciplinary grievance authority; an order precluding the introduction of evidence or the litigation of an issue; an order dismissing a claim or defense; dismissal of the action; entry of a default judgment; injunctive relief limiting a party's future access to the courts; and censure, suspension, or disbarment from practicing before the forum court, subject to applicable rules or statutes.[42]

While *Thomas* requires a sanction once a violation has been determined, it is necessary for the Court to determine the relative culpability of each person and to apportion such sanctions among the offending persons in a manner that reflects the extent and result of each person's individual violations.[43] Where the attorney and the client share responsibility for litigation strategy that violates Rule 11, the Court may impose joint and several liability.[44] The mere fact that an attorney carried out his client's instructions does not shelter the attorney from sanctions.[45]

As noted earlier, reasonable expenses and attorneys fees are expressly provided for by Rule 11. "What constitutes 'reasonable expenses' and 'reasonable attorney's fee' within the context of Rule 11 must be considered in tandem with the rule's goals of deterrence, punishment, and compensation. In this respect, ... 'reasonable' does not necessarily mean actual expenses."[46] If a party seeks attorneys' fees and expenses, that party "has a duty to mitigate those expenses, by correlating his response, in hours and funds expended, to the merits of the claims. If a litigant fails to do so, the district court may exercise its discretion and either reduce the award accordingly, or in some instances, decline to award any expenses."[47] In this regard, a party seeking sanctions "should give notice

must be as set forth in *Thomas,* the court stated: **"We believe all these comments are equally applicable to section 1927."** *Id.* at 1197 (emphasis supplied). *See also Jackson Marine Corp. v. Harvey Barge Repair, Inc.,* 794 F.2d 989, 992 (5th Cir.1986); *In re Hunt,* 754 F.2d 1290, 1294 (5th Cir.1985).

**37.** The Court recognizes that 28 U.S.C. § 1927 does not apply to Dr. Smith, but only to his attorneys. No sanctions have been made against Dr. Smith under Section 1927.

**38.** *Thomas,* 836 F.2d at 876–78.

**39.** *Id.* at 879.

**40.** *Id.* at 878.

**41.** *Id.* at 877–78.

**42.** "Standards and Guidelines for Practice under Rule 11 of the Federal Rules of Civil Procedure," American Bar Association Section of Litigation, 121 F.R.D. 101, 124 (1988).

**43.** *Smith Int'l, Inc. v. Texas Commerce Bank, N.A.,* 844 F.2d 1193, 1201–02; *Chevron, U.S.A., Inc. v. Hand,* 763 F.2d 1184, 1187 (10th Cir. 1985); *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1178–79 (D.C.Cir.1985).

**44.** *NASCO, Inc. v. Calcasieu Television and Radio, Inc.,* 124 F.R.D. 120 (W.D.La.1989), *aff'd and remanded in part,* 894 F.2d 696 (5th Cir 1990), *cert. granted,* — U.S. —, 111 S.Ct. 38, 112 L.Ed.2d 15 (1990); *Roberts v. Chevron U.S.A., Inc.,* 117 F.R.D. 581 (M.D.La.1987), *aff'd,* 857 F.2d 1471 (5th Cir.1988); *Florida Monument Builders v. All Faiths Memorial Gardens,* 605 F.Supp. 1324, 1327 (S.D.Fla.1984).

**45.** *In re TCI, Ltd.,* 769 F.2d 441, 446 (7th Cir. 1986), wherein the court noted that "[w]hen lawyers yield to the temptation to file baseless pleadings to appease clients, ... they must understand that their adversary's fees become a cost of **their** business." (emphasis in original).

**46.** *Thomas,* 836 F.2d at 879.

**47.** *Id.* (citations omitted).

to the court and the offending party promptly upon discovering a basis for doing so." [48] Although bad faith is not necessary for an award of fees under Rule 11, where a party acts in subjective bad faith, the court may increase the amount of fees that reasonably may be awarded.[49] Finally, the reasonableness of the fee depends in part upon the sanctioned party's ability to pay the fee.[50]

Following the mandate set forth in the above jurisprudence, the Court shall separately consider the nature and type of sanctions to be imposed on each of the violators. For reasons which follow, the Court finds that the least severe sanctions that should be imposed on Wittmann, Landis, Randall A. Smith, and their client, Dr. Prentiss Smith, are a monetary sanction in an amount to be determined below and a public reprimand on the attorneys. A monetary sanction shall not be imposed on Winsberg because he was not a member of the Stone, Pigman firm at the time the suit was filed, or during the entire time this case was pending.[51] Furthermore, Winsberg lacked the training and experience of the other attorneys in this case and was, during the pertinent times, the lowest ranking member of the firm.[52] The specific sanction to be imposed on Winsberg will be set forth separately in this opinion. The Court shall also separately consider the rule directed to Landis and Winsberg to show cause why they should not be suspended or disbarred from practice from the Middle District of Louisiana for the brief filed and oral arguments made in connection with the second motion to disqualify.

### A. Sanctions Against Wittmann, Landis, Randall A. Smith, and Dr. Prentiss Smith

■ The least severe sanctions which the Court finds appropriate under the facts of this case against Wittmann, Landis, Randall A. Smith, and Dr. Prentiss Smith are a monetary sanction and a public reprimand against the attorneys. This decision is based on a number of factors which were previously discussed in this opinion. The Court finds that these offenders willfully acted in bad faith and with vindictiveness. Because of their expertise and experience in the matter before the Court, and the facts available to all parties, these offenders must be held accountable for their actions. It is clear that the defendants were prejudiced by the offenders' actions in this case not only because of the amount of attorneys' fees incurred in defending this action, but also because of the slanderous and baseless allegations made in this case. A monetary sanction is also required to enforce the goals of punishment, deterrence, and compensation where the Court finds Rules 11 and 26(g), and Section 1927

---

**48.** *Id.* (quoting the advisory committee notes to Rule 11) (emphasis in original). As noted earlier in this opinion, the defendants placed the plaintiff and his attorneys on notice of their intent to seek Rule 11 sanctions as early as March 9, 1988. *See supra* text at 142.

**49.** *Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 157–58 (3rd Cir.1986); *Bastien v. R. Rowland & Co.,* 116 F.R.D. 619 (E.D.Mo.1987), *aff'd,* 857 F.2d 482 (8th Cir.1988), *cert. denied,* 490 U.S. 1081, 109 S.Ct. 2101, 104 L.Ed.2d 662 (1989).

**50.** *Oliveri v. Thompson,* 803 F.2d 1265, 1281 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); *In re Yagman,* 796 F.2d 1165, 1185 (9th Cir.1986), *cert. denied,* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987).

**51.** Winsberg's name was not on the original complaint. A letter bearing the letterhead of the Stone, Pigman firm which was attached to a motion for an enlargement of time filed by the defendants on August 3, 1987, does not include his name. Document 9 in the record. Winsberg's name first appears on a document filed with the Court on October 29, 1987, when the plaintiff filed a statement of issue on appeal. Document 33 in the record. Winsberg began signing documents in late 1987 and early 1988. For some reason, his name was not on the letterhead for a period of time, and then reappeared on the letterhead in June of 1989. In August of 1989, his name reappeared on the signature line of pleadings. However, the only document he signed was the second motion to recuse for which sanctions have been imposed and a show cause order issued. This latter show cause order will be discussed separately in this opinion. *See also* Affidavit of Marc D. Winsberg, appended to the plaintiff's Memorandum and Supplemental Submissions, filed September 11, 1990.

**52.** *See* Document 33 in the record. Winsberg is the last attorney on the letterhead.

have been violated, and sanctions should be imposed under the Court's inherent power to impose sanctions. Finally, the Court also considers the extent to which the offenders persisted in advancing this litigation after having been put on notice that their position was not grounded in fact or warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.

Having found that a monetary sanction should be imposed, the Court must examine the request for attorneys' fees and expenses submitted by the defendants in this case. The Court has meticulously examined the volumes of records submitted to the Court which detail the attorneys' fees sought by the defendants in this case. The Court's analysis of these fees is provided in the Appendix to this opinion. In the Appendix, the Court has set forth the fees charged by each firm which represented the defendants, as well as the plaintiff's objections to the fees. The Appendix also segregates the fees between those charged by the defendants' attorneys in defending the RICO action before the plaintiff dismissed the RICO suit, and the fees incurred in seeking sanctions and defending the plaintiff's second motion to disqualify.

For the period from June 26, 1987, through September 14, 1988, the date the RICO action was dismissed, the defendants seek $234,004.28 in attorneys' fees and expenses.[53] Post dismissal fees sought by the defendants total $141,414.90.[54] Thus, the total of the pre-adjusted fees and expenses sought by the defendants is $375,419.18.[55]

The plaintiff objects to $51,886.26 of the fees and expenses on the basis of errors, duplicated expenses, or that the fees were not caused by the violations.[56] The Court finds these objections to be valid. The Court will deduct the sum of $51,886.26 from the amounts sought by the defendants.[57] Thus, the adjusted fees and expenses involved in this case total $323,523.92.[58]

The issue now before the Court is whether this amount is reasonable under the facts of this case. The Court finds that the fees incurred by the defendants for defending the RICO action, as adjusted, are reasonable.[59] Thus, the Court will award the sum of $198,143.37 to the defendants as a sanction in this case.[60] It is also clear that the defendants are entitled to a fee for seeking sanctions in this case and for defending the plaintiff's second motion to disqualify the Court.[61] Therefore, the Court shall approve the sum of $125,389.55 as an additional sanction for attorney's fees and expenses incurred by the defendants in seeking sanctions and defending the plaintiff's second motion to disqualify.[62] Thus, the total monetary sanction to be awarded the defendants in this case is $323,532.92.[63] The Court finds that this monetary sanction is fair, reasonable, required, and justified under the facts of this case for the violators' failure to carry out their responsibility to validate the truth and legal reasonableness of their careless and malicious

---

**53.** Appendix, Part I(A)(1) & (B).

**54.** *Id.*, Part I(A)(2) & (C).

**55.** *Id.*, Part I(A)(3).

**56.** The largest of these objections is $45,400.01, which was a fee charged by the attorneys for the Society of Thoracic Surgeons.

**57.** Appendix, Part II(A).

**58.** The Court notes that the defendants claim in their briefs that they have mitigated expenses in the sum of $50,567.70 by sharing the work and files of various attorneys who represented the defendants in this case. *See* Appendix, Part I(E).

**59.** This conclusion is based on the discussion set forth in Parts I through V of this opinion.

**60.** This fee was calculated as follows: $234,004.28 minus $35,861.91 (objected to by the plaintiff) equals $198,143.37. *See* Appendix, Part (II)(B)(1).

**61.** *NASCO, Inc. v. Calcasieu Television and Radio, Inc.*, 124 F.R.D. 120 (W.D.La.1989), *aff'd and remanded in part*, 894 F.2d 696 (5th Cir. 1990), *cert. granted*, —— U.S. ——, 111 S.Ct. 38, 112 L.Ed.2d 15 (1990); *John v. Louisiana*, 899 F.2d 1441 (5th Cir.1990); *Batson v. Neal Spelce Assoc., Inc.*, 805 F.2d 546 (5th Cir.1986).

**62.** Appendix, Part II(B)(2).

**63.** Appendix, Part II(B)(3).

actions and pleadings in this case. The Court further finds this monetary sanction is reasonably tailored to further the objectives of the rules and statute violated and the inherent power of the Court to impose sanctions. Finally, the Court shall require that Wittmann, Landis, Randall A. Smith, and Dr. Prentiss Smith be jointly and severally liable for this monetary sanction.

In addition to the monetary sanction set forth above, the Court finds that Wittmann, Landis, and Randall A. Smith shall receive a public reprimand for their conduct in this case. The Court shall require that the Clerk of this Court place a notation on the admission papers of each of these attorneys that a public reprimand has been issued in this case against each of them.

### B. *Sanctions against Winsberg*

■ The Court finds that the sanctions to be imposed on Winsberg should be different from those imposed on the other attorneys in this case. Winsberg's actions in this case cannot be excused or tolerated by the Court. Nor can this Court condone Winsberg's conduct in this case. However, the Court finds that there are mitigating factors involved which suggest that sanctions other than a monetary sanction should be imposed on Winsberg.

The Court has previously noted that Winsberg lacked the training and experience of the other attorneys in this case who represented the plaintiff. It is apparent from the record that Winsberg is a recent graduate whose name was not even on the Stone, Pigman letterhead or the original complaint at the time this suit was filed.[64] During most of the time this suit was pending, Winsberg was at or near the bottom of the list of attorneys set forth on the Stone, Pigman letterhead.[65] The fact that Winsberg is a young lawyer who recently graduated from law school does not excuse him from the outrageous conduct previously described in this opinion. Indeed, the United States Supreme Court has noted that the "purpose of Rule 11 as a whole is to bring home to the individual signer his personal, nondelegable responsibility."[66] However, Winsberg's inexperience and his status in the firm do serve as mitigating factors in determining what sanctions should be imposed.

The Court believes justice would best be served if the Court orders Winsberg to attend a continuing legal education program approved by the Court on the Federal Rules of Civil Procedure and Federal Practice as a sanction. In addition, the Court shall require that Winsberg attend a minimum of five meetings of an Inns of Court program.[67] Finally, the Court shall issue a public reprimand to Winsberg which the Clerk of this Court shall note on Winsberg's admission papers on file in the records of this Court.

### C. *Rule to Show Cause Why Landis and Winsberg Should Not Be Suspended or Disbarred from Practice in the Middle District of Louisiana*

■ On August 27, 1990, this Court issued an order requiring Landis and Winsberg to show cause why they should not be

---

**64.** It is hoped that the attorneys in the Stone, Pigman firm were not forcing or requiring Winsberg to sign the various pleadings he signed because he was the youngest member of their firm. This is a particular concern of the Court since the Supreme Court has ruled that only the attorney who signs the pleading, and not the firm can be sanctioned under Rule 11. *See Pavelic and LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). However, even if this was the case, it is clear that the "signing attorney cannot leave it to some trusted subordinate, or to one of his partners, to satisfy himself that the filed paper is factually and legally responsible; by signing

he represents not merely the fact that it is so, but also the fact that he personally has applied his own judgment." 110 S.Ct. at 459.

**65.** According to the last correspondence set forth in the record from the Stone, Pigman firm, Winsberg is now listed ninth from the bottom on the list of attorneys.

**66.** 110 S.Ct. at 460.

**67.** The Inns of Court programs are designed to demonstrate and encourage professionalism and ethical conduct on the part of the members of the bench and bar.

suspended or disbarred from the practice of law in the Middle District of Louisiana because of the brief submitted and the oral arguments made in connection with the plaintiff's second motion to disqualify this judge from presiding in this case. At the time the brief was initially filed, only Winsberg had signed the document. During the oral argument on the motion, Landis also signed the brief in open court.[68]

The irresponsible and baseless allegations made in the brief and in oral argument, which were directed against this judge personally and against the administration of justice in the Middle District of Louisiana, cannot be permitted. Personal attacks and abusive language directed to the Court are unnecessary and constitute a serious threat to the administration of justice.[69] Whatever counsel may personally think of this judge cannot justify or excuse the conduct demonstrated by Landis and Winsberg in their brief and oral arguments.[70] Indeed, attorneys have been and continue to be officers of the court. As such, they have a duty and obligation to show respect and dignity for the court and the administration of justice irrespective of who the judge may be in the case. This duty and obligation should not arise solely because there may be a local rule of court or because the Rules of Professional Conduct of the Louisiana State Bar Association may require it. Instead, the honor and privilege of practicing as an attorney and member of bar should instill in all who hold this special honor and privilege a high level of professionalism and a duty to avoid conduct that offends the dignity and decorum

of our judicial proceedings and the administration of justice. We, who are members of the legal profession, should carefully consider the report of the Commission on Professionalism to the Board of Governors and the House of Delegates of the American Bar Association,[71] wherein the following question is asked in the introductory statement: "Has our profession abandoned principle for profit, professionalism for commercialism?"[72] The preface of this Report states: "The citizens of this country should expect no less than the highest degree of professionalism when they have entrusted administration of the rule of law—one of the fundamental tenets upon which our society is based—to the legal profession." [73]

The Court does not intend to dignify the statements made in the brief and oral argument which are the subject of this rule to show cause by repeating them in this opinion.[74] However, this Court did and continues to recognize the serious consequences which would fall on Landis and Winsberg if they were stripped of their privilege of practicing law in this district. Therefore, after the rule to show cause had been issued, the Court, *on its own*, scheduled and conducted several conferences with counsel who represent Landis and Winsberg in connection with this matter. After fully discussing the matter with counsel, this Court has agreed to accept a public letter of apology, explanation, and retraction which was signed by Landis and Winsberg and submitted to the Court in lieu of suspending or disbarring these two attorneys from practicing law in the Middle

---

**68.** Landis signed the brief without taking the time to read it. However, the Court assumes Landis read the brief and made the proper inquiries required by the Federal Rules of Civil Procedure prior to addressing the Court.

**69.** The Fifth Circuit has criticized similar attacks on opposing counsel in *Coats v. Pierre,* 890 F.2d 728, 734 (5th Cir.1989), wherein the court stated: "Abusive language toward opposing counsel has no place in documents filed with our courts; the filing of a document containing such language is one form of harassment prohibited by Rule 11."

**70.** Winsberg did not make any court appearances or oral arguments on the second motion to recuse.

**71.** 112 F.R.D. 243 (1987).

**72.** *Id.* at 251.

**73.** *Id.* at 250. The Report recommends that "[a]ll segments of the Bar should: ... (2) Resolve to abide by higher standards of conduct than the minimum required by the Code of Professional Responsibility and the Model Rules of Professional Conduct." *Id.* at 265.

**74.** *See supra* note 7.

District of Louisiana.[75] Because of the sanctions previously imposed in this case, including a public reprimand, the Court believes that this public apology and retraction is a satisfactory sanction against Landis and Winsberg for their actions associated with the second motion to disqualify. Accordingly, the rule to show cause issued on August 27, 1990, will be dismissed.

## VIII. ORDER

For reasons set forth above:

IT IS ORDERED that sanctions shall be imposed on Phillip A. Wittmann, John M. Landis, Randall A. Smith, and Marc D. Winsberg under Rules 11 and 26(g) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the inherent power of the Court to impose sanctions.

IT IS FURTHER ORDERED that sanctions shall be imposed on Dr. Prentiss Smith under Rules 11 and 26(g) of the Federal Rules of Civil Procedure, and the inherent power of the Court to impose sanctions.

IT IS FURTHER ORDERED that Phillip A. Wittmann, John M. Landis, Randall A. Smith, and Dr. Prentiss Smith shall jointly and severally pay the sum of $323,532.92, together with interest as provided in 28 U.S.C. § 1961, to the following parties in the following amounts: 1) Dr. Kenneth C. Cranor, Dr. A. Foster Sanders, Dr. Donald R. Cowick, Dr. W. Howard Kisner, and Dr. Louis P. Laville, Jr., in the amount of $173,001.91; 2) Our Lady of the Lake Hospital, Inc., Dr. M.J. Rathbone, Jr., Dr. W. Redfield Bryan, Mr. Sidney Duplessis, Mr. W.H. LeBlanc, Jr., Mr. Roland Toups, and Mr. Robert C. Davidge, in the amount of $59,967.31; 3) Dr. B. Eugene Berry in the amount of $89,522.54; 4) Dr. B. Eugene Berry in the amount of $845.41; and 5) Dr. W. Redfield Bryan in the amount of $195.75.

IT IS FURTHER ORDERED that Phillip A. Wittmann, John M. Landis, Randall A. Smith, and Marc D. Winsberg be and each is given a public reprimand. The Clerk of this Court shall note this public reprimand on the admission records of each of these attorneys.

IT IS FURTHER ORDERED that Marc D. Winsberg shall, within six months of the date of this order: (1) PERSONALLY attend a continuing legal education program on the Federal Rules of Civil Procedure and Federal Rules of Practice which shall be approved in advance in writing by this Court; (2) PERSONALLY attend five Inns of Court meetings of his choice and certify to the Court in writing that he has in fact complied with this sanction.

IT IS FURTHER ORDERED that the Court shall accept the letter of John M. Landis and Marc D. Winsberg of September 26, 1990, as a public apology, explanation, and retraction to the Court insofar as the Rule to Show Cause of August 27, 1990, is concerned.

IT IS FURTHER ORDERED that the Rule to Show Cause directed to John M. Landis and Marc D. Winsberg be and it is hereby dismissed.

Judgment shall be entered accordingly.

## APPENDIX

Preface to Appendix:

The fees and out-of-pocket expenses submitted by the law firms on behalf of their respective clients are broken down into the amounts incurred during the RICO litigation (RICO Action) and the amounts incurred after the RICO suit was dismissed, including the sanction litigation (Sanction/Post–RICO).

In this Appendix, the fees and reimbursement calculations are presented on individual firm basis. However, the sanctions awarded herein shall be paid to each firm's respective client(s). The clients represented by each firm are as follows:

---

**75.** *See* Letter of September 26, 1990, which was received by the Court on October 22, 1990. Document 173 in the record.

Taylor, Porter, Brooks
    & Phillips (Taylor, Porter):

                                Dr. Kenneth C. Carnor
                                Dr. A. Foster Sanders
                                Dr. Donald R. Cowick
                                Dr. W. Howard Kisner
                                Dr. Louis P. Laville, Jr.

Durrett, Hardin, Hunter, Dameron
    & Fritchie (Durrett, Hardin):

                                Our Lady of the Lake
                                    Hospital, Inc. (OLOL)
                                Dr. M.J. Rathbone, Jr.
                                Dr. W. Redfield Bryan
                                Mr. Sidney Duplessis
                                Mr. W.H. LeBlanc, Jr.
                                Mr. Roland Toups
                                Mr. Robert C. Davidge

Gary, Field, Landry
    & Dornier (Gary, Field):                    Dr. B. Eugene Berry

Seale, Smith, Zuber
    & Barnette (Seale, Smith):                Dr. B. Eugene Berry

Rubin, Curry, Colvin
    & Joseph (Rubin, Curry):                Dr. W. Redfield Bryan

## I.  DEFENDANTS' QUANTUM FIGURES

A.  Fees & Out-of-Pocket Expenses Submitted in the Defendants' <u>Sanction Quantum Date</u>, filed August 3, 1990, and <u>Supplemental Sanction Quantum Data</u>, filed September 6, 1990, Motions:

    1.  Fees During RICO Action,
       6/26/87—9/14/88:                                $234,004.28

    2.  Fees For Sanction/Post–RICO
         a.  9/15/88—6/21/90:                       $110,489.85
         b.  After 6/21/90: [1]                    $ 30,925.05

            Total Sanction/Post–RICO Fees:       $141,414.90

    3.  Total Fees Charged to Defendants:       $375,419.18

B.  Fees & Out-of-Pocket Expenses Per Firm for RICO Action: (6/26/87—9/14/88):

         a.  Taylor, Porter:
            i. legal fees               $ 94,282.50
            ii. out-of-pocket       16,139.76      $110,422.26

         b.  Durrett, Hardin: [2]
            i. legal fees               $ 41,875.00
            ii. out-of-pocket        1,667.72      $ 43,542.72

         c.  Gary, Field:
            i. legal fees               $ 44,146.50
            ii. out-of-pocket        3,216.14      $ 47,362.64

         d.  Jenner & Block:
            i. legal fees               $ 29,843.91
            ii. out-of-pocket        2,637.00      $ 32,480.91

         e.  Rubin, Curry:
            i. legal fees               $   195.75      $   195.75

            Total:                             $234,004.28

C.  Fees & Out-of-Pocket Expenses Per Firm for Sanction/Post–RICO:

    1.  Period 9/15/88—6/21/90:

---

[1]. These fees and out-of-pocket expenses, which were submitted to the Court in the defendants' supplemental quantum motion, filed September 6, 1990, represent amounts which either 1) predated 6/21/90, but not yet billed or paid by the client, or 2) were posted after 6/21/90.

[2]. This figure includes $750.00 paid directly by Durrett, Hardin's client, Our Lady of the Lake Hospital, to Dr. David Leamann, a medical expert consulted during the RICO litigation.

a. Taylor, Porter:
    i. legal fees            $ 48,718.75
    ii. out-of-pocket       3,428.91       $ 52,147.66

b. Durrett, Hardin:
    i. legal fees            $ 12,275.00
    ii. out-of-pocket       309.14       $ 12,584.14

c. Gary, Field:
    i. legal fees            $ 29,621.75
    ii. out-of-pocket       3,217.20       $ 32,838.95

d. Jenner & Block:
    i. legal fees            $ 12,919.10       $ 12,919.10
    Sub–Total:                          $110,489.85

2. Period After 6/21/90:
    a. Taylor, Porter:
        i. legal fees            $ 13,240.00
        ii. out-of-pocket       2,459.49       $ 15,699.49

    b. Durrett, Hardin:
        i. legal fees            $ 4,998.00
        ii. out-of-pocket       61.20       $ 5,059.20[3]

    c. Gary, Field:
        i. legal fees            $ 8,800.75
        ii. out-of-pocket       520.20       $ 9,320.95

    d. Seale, Smith: [4]
        i. legal fees            $ 845.41       $ 845.41
        Sub–Total                      $ 30,925.05
        Total:                          $141,414.90

D. Total Pre–Adjustment Fees & Out-of-Pocket Expenses Per Firm:
    a. Taylor, Porter:
        i. legal fees            $156,241.25
        ii. out-of-pocket       22,028.16       $178,269.41

    b. Durrett, Hardin:
        i. legal fees            $ 59,148.00
        ii. out-of-pocket       2,038.06       $ 61,186.06

    c. Gary, Field:
        i. legal fees            $ 82,569.00
        ii. out-of-pocket       6,953.54       $ 89,522.54

    d. Seale, Smith:
        i.                    $ 845.41       $ 845.41

    e. Jenner & Block:
        i. legal fees            $ 42,763.01
        ii. out-of-pocket       2,637.00       $ 45,400.01

    f. Rubin, Curry:
        i. legal fees            $ 195.75       $ 195.75
        Total:                          $375,419.18 [5]

E. Mitigation of Fees & Expenses Per Defendants' Motion filed August 3, 1990—Savings Attributed to Avoided Duplication: [6]
    1. Photocopying of Deposition Transcripts:       $ 10,550.40

**3.** The total of the invoices submitted was incorrectly calculated by the defendants as "$5,052.20." The corrected total is $5,059.20 ($4,998.00 + $61.20).

**4.** Seale, Smith chose not to seek reimbursement pursuant to the sanction proceeding, except for the later portion of this litigation. Seale, Smith did not submit any invoices or affidavits with the defendants' motion filed September 6, 1990; therefore, the figure of $845.41 was derived by subtracting the total of the submitted invoices, $30,079.64, from the total amount claimed by all the attorneys, $30,925.05.

**5.** Defendants' counsel states that their figures are "substantially correct, perhaps with a margin of error of 5%, plus or minus." *See* the defendants' Response to Memorandum of Plaintiff's Former Counsel on Quantum of Sanctions, filed September 14, 1990, at 5 [hereinafter Response].

**6.** These mitigation figures were already reflected in the fees and out-of-pocket expenses figures submitted by the defendants.

a. savings generated by ordering only one copy of the depositions from the reporter ($3,956.40) and making 3 copies (2,198 pgs. × .20/pg. × 3); avoided cost of 3 additional reporter copies less in-house copy cost.

2. Avoided Coping Cost of Medical Files:   $ 1,744.80

 a. did not provide 3 separate copies of medical documents (2,908 pgs.); avoided copy cost (2,908 pgs. × .20/pg. × 3).

3. Use of Common Single Deposition Digest:   $ 38,272.50

 a. Taylor, Porter created a single deposition digest for common use; claimed it cost $12,757.50 to create (205.25 hours @ $62.15 aver. billing rate); avoided similar cost by other 3 law firms ($12,757.50 × 3).

  Total Mitigation Submitted By Defendants:   $ 50,567.70

## II. ADJUSTMENTS BY THE COURT TO THE DEFENDANTS' QUANTUM FIGURES

A. Plaintiff's Response to the Defendant's Quantum Figures; Court Approved Adjustments:[7]

1. Itemized Errors & Amounts:

 a. Legal fees charged by Jenner & Block, attorneys for the Society of Thoracic Surgeons, who were not made party to the litigation (RICO—$32,480.91, Sanction/Post–RICO—$12,919.10).[8]  $ 45,400.01

 b. Fee paid to Dr. David Leamann by OLOL, and included in Durrett, Hardin's fees, which was incurred in connection with RICO litigation.  $ 750.00

 c. 7/15/87, double entry for Lunceford (Taylor, Porter); adjustment—8 hrs. @ $100.00/hr.  $ 800.00

 d. 7/17/89, double entry for Lunceford (Taylor, Porter); adjustment—4 hrs. @ $100.00/hr.  $ 400.00

 e. 2/13/89—2/20/89, research not related to sanction action (Taylor, Porter $1,725.00; Durrett, Hardin $468.75); adjustment[9]  $ 2,193.75

 f. 4/20/89, double entry for Lunceford (Taylor, Porter); adjustment—2 hrs. @ $100.00/hr.  $ 200.00

 g. 8/11/87, incorrect billing rate used should have been $40.00, not $100.00 (Taylor, Porter); adjustment—19.25 hrs. @ $60.00/hr.  $ 1,155.00

 h. 1/25/88, incorrect number of hours for Lunceford (Taylor, Porter), actual hours are 13.25, not 20.00; adjustment—6.75 hrs. @ $100.00/hr.  $ 675.00

 i. 10/25/88 & 10/26/88, Phillip's time billed for another, unrelated client (Taylor, Porter); adjustment—2.50 hrs. @ $125.00/hr.  $ 312.50

  Total Adjustments:   $ 51,886.26

7. *See* Plaintiff's Memorandum and Supplemental Submissions, filed September 11, 1990, at 22–24, and Defendants' Response, *supra* note 6.

8. These expenses were objected to in plaintiff's Memorandum and Supplemental Submissions, filed September 11, 1990, at 22.

9. *See* Defendants' Sanctions Quantum Data, filed August 3, 1990, section entitled "Summary of Defendants' Attorney Fees and Expenses Incurred In Smith v. OLOL, et al. Litigation," at 1–2 (2/9/89, 2/10/89, 2/20/89, & 2/21/89), 16 (2/13/89, 2/16/89), and 19 (2/13/89—2/17/89), totaling $2,193.75.

Total Error Adjustment Per Period:
    a.  RICO Action (6/26/87—9/14/88):          $ 35,860.91
    b.  Sanction/Post–RICO (after 9/14/88):     $ 16,025.35

B.  Total Adjusted Fees & Out-of-Pocket Expenses:
   1.  RICO:       $234,004.28—$ 35,860.91  =       $198,143.37
   2.  Sanction/Post–RICO:
               $141,414.90 − $ 16,025.35 =     $125,389.55
   3.  Adjusted Total:                        $323,532.92

### III. APPORTIONMENT OF ADJUSTED QUANTUM PER LAW FIRM

Total Adjusted Fees & Out-of-Pocket Expenses by the Court per Firm:

  1.  Taylor, Porter, Brooks & Phillips:

| | | | |
|---|---|---|---|
| a. | RICO Action Fee | $110,422.26 | |
| | Less: Adjustment [10] | ( 2,630.00) | |
| | | $107,792.26 | |
| b. | Sanction/Post–RICO Fee | $ 67,847.15 | |
| | Less: Adjustment | ( 2,637.50) | |
| | | $ 65,209.65 | |
| | Total Amount Due | | $173,001.91 [11] |

  2.  Durrett, Hardin, Hunter, Dameron & Fritchie:

| | | | |
|---|---|---|---|
| a. | RICO Action | $ 43,542.72 | |
| | Less: Adjustment | ( 750.00) | |
| | | $ 42,792.72 | |
| b. | Sanction/Post–RICO | $ 17,643.34 | |
| | Less: Adjustment | ( 468.75) | |
| | | $ 17,174.59 | |
| | Total Amount Due | | $ 59,967.31 [12] |

  3.  Gary, Field, Landry & Dornier:

| | | | |
|---|---|---|---|
| a. | RICO Action | $ 47,362.64 | |
| b. | Sanction/Post–RICO | $ 42,159.90 | |
| | Total Amount Due | | $ 89,522.54 [13] |

  4.  Seale, Smith, Zuber & Barnette:

| | | | |
|---|---|---|---|
| a. | RICO Action | $ 0.00 | |
| b. | Sanction/Post–RICO | $ 845.41 | |
| | Total Amount Due | | $ 845.41 [14] |

  5.  Rubin, Curry, Colvin & Joseph:

| | | | |
|---|---|---|---|
| a. | RICO Action | $ 195.75 | |
| b. | Sanction/Post–RICO | $ 0.00 | |
| | Total Amount Due | | $ 195.75 [15] |
| | Total Amount of Sanction: | | $323,532.92 |

---

**10.**  See supra, Part II(A)(1), for actual adjustment amounts attributable to each firm.

**11.**  This sanction shall be paid to Dr. Kenneth C. Carnor, Dr. A. Foster Sanders, Dr. Donald R. Cowick, Dr. W. Howard Kisner, and Dr. Louis P. Laville, Jr.

**12.**  This sanction shall be paid to Our Lady of the Lake Hospital, Inc., Dr. M.J. Rathbone, Jr., Dr. W. Redfield Bryan, Mr. Sidney Duplessis, Mr. W.H. LeBlanc, Jr., Mr. Roland Toups, and Mr. Robert C. Davidge.

**13.**  This sanction shall be paid to Dr. B. Eugene Berry.

**14.**  This sanction shall be paid to Dr. B. Eugene Berry.

**15.**  This sanction shall be paid to Dr. W. Redfield Bryan.